**Randall J. SOILEAU, Plaintiff,**

v.

**GUILFORD OF MAINE, INC., Defendant.**

**Civil No. 95–162–B.**

United States District Court, D. Maine.

June 10, 1996.

---

**42**

Martha S. Temple, Foote & Temple, Bangor, Maine, for plaintiff.

Richard G. Moon, Moon, Moss, McGill & Bachelder, P.A., Portland, Maine, for defendant.

---

ORDER AND MEMORANDUM
OF DECISION

BRODY, District Judge.

Plaintiff, Randall J. Soileau sues Guilford of Maine, Inc. ("Guilford"), his former employer, pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12001–12213, and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4571–4660–A.[1] Soileau claims that he was harassed and discriminated against because of an actual and/or perceived disability. He also claims that he was later retaliated against due to his request for a reasonable accommodation. Defendant disputes these allegations and moves for summary judgment. For the following reasons, the Court grants Defendant's Motion.

### I. Background

Guilford is incorporated in, and maintains its principal place of business in the State of Maine. Plaintiff Randall J. Soileau, a resident of Dover–Foxcroft, Maine, worked at Guilford in various capacities over the course of fifteen years. Soileau began as a laborer in the blending department, in 1979. Beginning in 1986, Soileau worked in the industrial engineering department, where his duties included various special projects, such as production time studies and process activity

---

1. Soileau asserts four claims in his Complaint: unlawful discrimination in employment on the basis of an actual and/or perceived disability (Count I); unlawful retaliation in employment on the basis of an actual or perceived disability (Count II) (reasonable accommodation claim); harassment in employment on the basis of an actual and/or perceived disability (Count III); and violation of the MHRA (Count IV).

analyses ("PAA").[2] According to Soileau, he served Guilford effectively and without incident for over eleven years, receiving evaluations ranging from good to excellent. Indeed, as late as December of 1990, Soileau received an "excellent" evaluation. Soileau's tenure after 1992, however, was more troubled, due in part, he contends, to the hiring of Matt Earnest as his supervisor.

Guilford fired Soileau in April of 1994. The rationale behind Soileau's discharge lies at the heart of this suit. Soileau contends that Guilford fired him due to his mental impairment—an inability to "substantially interact with people around him." (Compl. ¶ 14.) Guilford disagrees, citing Soileau's repeated poor performance as the basis for his termination.

Soileau suffers from a psychological disorder. He experienced his first "depressive episode" in 1987. Later in 1989, Soileau experienced stress and symptoms of depression, for which he sought treatment from Dannel H. Starbird, Ph.D., a licensed psychologist. Dr. Starbird diagnosed Soileau as having dysthmia, "a mild to moderate often fairly chronic depressive condition." (Pl. Stat.Mat.Facts ¶ 25.) Due to this condition, Dr. Starbird "took Soileau out of work on a disability leave" in 1990. (Starbird Aff. ¶ 5.)

Starbird treated Soileau again in 1994 for similar problems, a condition that Starbird indicates will plague Soileau for the remainder of his life. Starbird describes Soileau's condition as an inability to interact with other people, either in groups or one-on-one for long periods of time. As a consequence of his ailment Soileau has experienced sleep loss, difficulty in concentrating, tearfulness, and difficulty in memory function. Soileau is also prone to depressive episodes.

Soileau's psychological difficulties, present in 1993, and symptomatic again in 1994, affect all areas of his life, including his job performance.[3] Furthermore his increased employment problems aggravated his psychological problems. Soileau claims that Guilford employees harassed him, and later discriminated against him due to his psychological disorder. Specifically, Soileau contends that his direct supervisor, Matt Earnest, chastised and humiliated him. Soileau claims that Earnest harassed him in more subtle ways as well. Soileau alleges, for example, that Earnest often assigned him tasks which were both inefficient and violative of company policy.

Earnest suspended Soileau for two days beginning on March 23, 1994, citing poor performance as a justification. Soileau contends that when questioned Earnest refused to detail the particular circumstances justifying the suspension, and when pressed, Earnest could not articulate, beyond generalities, any specific manner in which Soileau could improve his employment performance.[4] Earnest also allegedly acknowledged that accommodating Soileau's mental problems would create additional work.

In conjunction with his suspension, Guilford issued Soileau a final written warning, listing conditions, which if not met, would result in Soileau's termination. One such condition required Soileau to formulate and submit a written plan articulating how he would specifically improve his performance. It is undisputed that Soileau never completed the requested written improvement plan. Nevertheless Soileau contends that he did present a plan to Earnest. He claims, for example, that he "told [Earnest] that he was going to seek help for his mental health problems." (Resp., 9). Additionally, Soileau allegedly asked Earnest to relieve him from the duty of facilitating the PAA meetings.

Soileau claims there was no progression of discipline for his alleged poor performance. It is uncontested that Guilford terminated

---

**2.** Guilford describes a PAA as "a tool by which Guilford was attempting to improve its entire production process by gathering together key personnel involved in an area of the production process to analyze systematically how they were doing business." (Def.Mot.Summ.J. 6 n. 3.)

**3.** Soileau complained of difficulties being around people, frequenting his favorite pub at crowded times, shopping in crowds, and problems both attending and facilitating meetings at work.

**4.** Soileau contends that the substance of Earnest's recommendations was that he could have called employees by name at the PAA meetings, and "could have used a strategic pause to force people to talk." (Pl.Stat.Mat.Facts at ¶ 20.)

Soileau not long after suspending him. The events leading up to Soileau's termination included a series of meetings and correspondence between Soileau, Dr. Starbird, and Guilford management. Concerned about his suspension, and his deteriorating psychological state, Soileau informed Earnest of his condition in late March and again in early April, 1994. At a March 28th meeting between the two, convened at Earnest's request, Soileau apprised Earnest of his prior psychological problems, present difficulties, and current medication. At this meeting Soileau appealed to Earnest for help. On March 30th, Soileau again expressed concern about his condition, and asked Earnest to inform him of any signs manifesting his symptoms. Later in April, Soileau informed Earnest both that he had sought help from Dr. Starbird, and of his continuing inability to interact with other people.

In April Soileau specifically requested a modification of his employment duties to accommodate his psychological condition. On April 12, 1994, Soileau hand-delivered to Harold Way, the Guilford Human Resources Manager, a letter from Dr. Starbird. In that letter, Dr. Starbird requested that Guilford adopt a temporary modification of Soileau's working conditions. Specifically, Dr. Starbird asked that Guilford limit Soileau's duties, for a period of four months, to assignments that would not require him to substantially interact with other people. Dr. Starbird also suggested that Soileau not be subject to ridicule from Guilford employees. Dr. Starbird, however, did not suggest that Soileau take a leave of absence. To the contrary, Starbird suggested that given the necessary accommodations, Soileau could continue to work.

Way, in response, deferred the decision as to Starbird's request to Earnest, who at the time, and until April 21st, was not available at the Guilford plant in Maine. On April 21, 1994 Soileau finally met with Earnest to discuss the possibility of an accommodation. A day later, April 22, 1994, Earnest fired Soileau, and allegedly reassigned Soileau's duties to nondisabled employees.

Soileau claims his dismissal from Guilford violated of the ADA and MHRA. Soileau sought redress from both the Maine Human Rights Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC). Both agencies issued right-to-sue letters: the MHRC on April 26, 1995 and the EEOC on May 1, 1995.

## II. Summary Judgment

Summary judgment is appropriate in the absence of a genuine issue of any material fact, when the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Thus it is axiomatic that summary judgment must be denied when disputes remain as to consequential facts— facts upon which the outcome may rely. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Menard v. First Sec. Servs. Corp.*, 848 F.2d 281, 285 (1st Cir.1988). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R.Civ.P. 56(c). An issue is genuine, for summary judgment purposes, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A material fact is one which has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). The Court views the record in the light most favorable to the nonmoving party. *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

## III. ADA & MHRA

Both the ADA, and its state law analog, the MHRA, seek to root out discrimination against disabled individuals. 42 U.S.C. § 12101(b) ("It is the purpose of this chapter [of the ADA]—(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."); *Galloway v. Superior Court of District of Columbia*, 816 F.Supp. 12, 20 (D.D.C.1993) (The purpose of the Rehabilitation Act and the ADA is "to prevent old-fashioned and unfounded prejudices against disabled persons from interfering with those individuals' rights to enjoy the same privileges and duties afforded to all

United States citizens."); 5 M.R.S.A. § 4552 (The MHRA prohibits "discrimination in employment, housing or access to public accommodations on account of race, color, sex, physical or mental handicap ..."); *Winston v. Maine Technical College Sys.*, 631 A.2d 70, 74 (Me.1993) (The MHRA prohibits discrimination on the basis of a mental disability, and "[t]he provisions of the MHRA regarding mental disability are very similar to those contained in the [Rehabilitation Act, and thus by inference the ADA].*"), cert. denied*, — U.S. ——, 114 S.Ct. 1643, 128 L.Ed.2d 364 (1994).[5] Additionally both acts prohibit retaliation by an employer against an employee who enforces his or her rights under these statutes. 42 U.S.C. § 12203(a); 5 M.R.S.A. § 4572.

■ In analyzing the ADA and MHRA, the Court need not continuously distinguish between the two statutes as to their scope and general intent because Maine courts consistently look to federal law in interpreting state anti-discriminatory statutes. *Winston*, 631 A.2d at 74–75 (Me.1993); *Bowen v. Dept. of Human Services*, 606 A.2d 1051, 1053 (Me. 1992); *Plourde v. Scott Paper Co.*, 552 A.2d 1257, 1261–1262 (Me.1989). Thus while the Court will focus on the ADA, the necessary conclusions as to the Plaintiff's MHRA claim flow directly from this analysis.

■ The Court also notes that the well established *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting rubric applies to the ADA, as it does to federal anti-discrimination statutes generally, *Wooster v. Abdow Corp.*, 1996 WL 131143, *8 (D.Mass. 1996) (ADA and ADEA); *Nedder v. Rivier College*, 908 F.Supp. 66, 73 (D.N.H.1995) (ADA); *Braverman v. Penobscot Shoe Co.*, 859 F.Supp. 596, 603 (D.Me.1994) (ADEA and ADA). Maine courts also employ this burden shifting framework in certain discrimination cases, such as the one at bar. *Maine Human Rights Com'n v. Dept. of Corrections*, 474 A.2d 860, 866–67 (Me.1984); *Maine Human Rights Com'n v. City of Auburn*, 408 A.2d 1253, 1261–62 (Me.1979).

Title I of the ADA prohibits various forms of employment discrimination. The statute reads in relevant part:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

The statute itself defines several of its relevant terms, 42 U.S.C. § 12111, and the implementing regulations fill in the gaps where necessary, 29 C.F.R. Pt. 1630; *see* 42 U.S.C. § 12116. For example under the statute "covered entities" includes employers, 42 U.S.C. § 12111(2), and an employer is defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calender weeks in the current or preceding calender year," *id.* at 12111(5). More important to the case at hand, the statute defines "[a] qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Guilford does not dispute its status as a "covered entity" under the Act, but it does contest both the applicability, and application of the ADA to the facts at hand. That is, Guilford argues that the statute does not apply here because Soileau does not qualify as disabled under the terms of the statute, and that even if he did, Guilford fired Soileau because of his poor performance, and not for his alleged or perceived disability. Therefore, Guilford argues they did not violated the ADA. The Court addresses these arguments in turn.

## A. Discrimination and Harassment Claims

■ Soileau claims that he was discriminated against, as well as harassed, due to an

---

5. Congress passed the ADA in 1990 to deal with the over 43 million Americans who suffer from

mental and physical impairments. 42 U.S.C. §§ 12101(a)–(b)(1).

actual and/or perceived disability. To prove a prima facie case of discrimination under the ADA, Soileau must show that:

(1) he suffers from a disability as defined by the ADA;

(2) he is otherwise qualified, that is, with or without reasonable accommodations, he is able to perform the essential functions of the job; and

(3) his employer discriminated against him because of his disability.

*White v. York International Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995); *Howard v. Navistar Intern.*, 904 F.Supp. 922, 927 (E.D.Wis. 1995).

As to Soileau's harassment claim, courts that have recognized a cause of action under the ADA for harassment have analogized to Title VII in determining the necessary elements of this claim. The first such element requires that a plaintiff establish that he is within the protected class, which under the ADA, would require the plaintiff to qualify as disabled. *Haysman v. Food Lion, Inc.*, 893 F.Supp. 1092, 1106–07 (S.D.Ga.1995); *Mannell v. American Tobacco Co.*, 871 F.Supp. 854, 860 (E.D.Va.1994).

■■■■ Thus both Soileau's discrimination and harassment claims hinge first on his status as disabled under the ADA.[6] Not surprisingly, herein lies the first point of contention between the parties. Guilford argues that Soileau does not qualify as disabled under the ADA. The Court agrees, and therefore grants Defendant's Motion for Summary Judgment on the Count I discrimination claim, the Count III harassment claim, as well as the related Count IV MHRA claim.

■■■■ The Court turns to the prevailing standards governing a disability under the Act. The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).[7] Soileau claims he is disabled under both subsection (A) and subsection (C).

### 1. Subsection (A): Physical or Mental impairment

A disability under subsection (A) turns on three requirements: (1) a "physical or mental impairment," (2) "substantially limits," and (3) "major life activities." While cryptic standing alone, and undefined by the ADA itself, the relevant EEOC regulations lend interpretive guidance to this language. 29 C.F.R. Pt. 1630; 29 C.F.R. § 1630, Appendix to Part 1630—Interpretive Guidance on Title I of the Americans with Disabilities Act.[8] Courts have also provided guidance in defining these terms.

Guilford does not contest the mental impairment requirement, but it does dispute both the major life activity requirement and the substantial limitation prong of subsection

**6.** Under both Soileau's discrimination and harassment claims he must be disabled under the ADA to prevail. However, to prevail on an ADA retaliation claim, an employee need not necessarily be disabled. To establish a prima facie claim of retaliation under the ADA, a plaintiff must show: (1) that he or she engaged in activity protected by the ADA; (2) that adverse employment action has occurred; and (3) that a causal link exists between the protected activity and the adverse employment decision. *See Roth v. Lutheran General Hosp.*, 57 F.3d 1446, 1458 (7th Cir.1995); *Howard*, 904 F.Supp. at 931; *see also Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir.1994) (Title VII); *Hoeppner v. Crotched Mountain Rehabilitation Ctr. Inc.*, 31 F.3d 9, 14 (1st Cir.1994) (Title VII); *Hazel v. U.S. Postmaster General*, 7 F.3d 1, 3 (1st Cir.1993) (Title VII and ADEA).

**7.** The Court notes both that the ADA's definition of a "disability" tracks that of the Rehabilitation Act, 29 U.S.C. §§ 701–79, *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725 n. 4 (5th Cir. 1995); *Chandler v. City of Dallas*, 2 F.3d 1385, 1391 n. 18 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994), and that Congress intended the caselaw under the Rehabilitation Act to apply to the term "disability" as defined in the ADA, *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

**8.** The First Circuit has recognized that agency regulations are an appropriate place for "courts and litigants" to "properly resort for guidance." *Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 781 (1st Cir.1990).

(A). The Court reviews Soileau's claim against subsection (A)'s three requirements.

### a. Mental Impairment

■ Soileau claims his depressive condition falls within the ADA's mental impairment requirement. The Court agrees.

The implementing regulations construe a "physical or mental impairment" to include "[a]ny mental or psychological disorder," such as "[any] emotional or mental illness." 29 C.F.R. § 1630.2(h)(2). While this definition seems to set no appreciable threshold for the severity of mental or emotional distress actionable under the ADA, Soileau's case does not test the outer limits of the regulations.[9] Soileau has been diagnosed as suffering from chronic depression, which his psychologist, Dr. Starbird, characterizes as dysthmia. Courts have consistently held that depression constitutes a mental impairment under the ADA. 42 U.S.C. § 12102(2); *see, e.g., Pritchard v. Southern Co. Services, Inc.*, 1995 WL 338662, *6 (N.D.Ala.); *Stradley v. Lafourche Comm., Inc.*, 869 F.Supp. 442, 443 (E.D.La.1994); *see also Marschand v. Norfolk and Western Ry. Co.*, 876 F.Supp. 1528, 1530, 1538 (N.D.Ind.1995) (post-traumatic stress disorder, manifested by tension, anxiety and depression constitutes a mental impairment under the ADA), *aff'd*, 81 F.3d 714 (7th Cir.1996); *Doe v. Region 13 Mental Hlth–Mental Retard. Com'n*, 704 F.2d 1402, 1404, 1408 (5th Cir.) (depression considered a mental impairment under the Rehabilitation Act), *reh'g denied*, 709 F.2d 712 (5th Cir. 1983).

■ That Soileau suffers from a mental impairment alone, however, does not qualify him as disabled under the ADA. *See e.g., Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727 (5th Cir.1995) ("A physical [or mental] impairment, standing alone, is not necessarily a disability as contemplated by the ADA," this impairment must substantially limit a major life activity); *Muller v. Automobile Club of Southern California*, 897 F.Supp. 1289, 1297 (S.D.Cal.1995) (plaintiff's psychological problems alone, absent some showing that the problem substantially limited her major life activities, does not qualify plaintiff as disabled under the ADA).

### b. Major Life Activity

Soileau claims his mental impairment implicates two major life activities: (1) his ability to interact with other people, and (2) his ability to work. The ADA does not define a "major life activity," but the implementing regulations do. Title 29 C.F.R. § 1630.2(i) defines a "major life activity" as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."[10] It is undisputed, under the regulations and prevailing caselaw, that working is a major life activity. 29 C.F.R. § 1630.2(i); *see, e.g., Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995); *Vaughan v. Harvard Industries, Inc.*, 926 F.Supp. 1340 (W.D.Tenn.1996). Less certain, however, is whether Soileau's inability to interact with other people constitutes a "major life activity."

Soileau argues that his depression limits his major life activity of interacting with other people, including his co-employees, and his girlfriend. He claims he cannot visit his favorite pub, any shopping centers, or perform his employment related duties in crowds. Soileau contends that his mental distress has "seriously limited [ ] his ability to carry on his daily activities, and [that] his symptoms had a significant impact on him because he simply could not tolerate being around people and had to alter his routine to deal with his depression." (Resp. at 13.) As a consequence, he claims a jury could find his life was "onerous." *Id.*

■ While Soileau's contentions may be true, the fact that Soileau's disorder has

---

9. The EEOC qualifies its definition of "Disability" with a list of exceptions. 29 C.F.R. § 1630.3. These exceptions, however, do not significantly limit the expansive scope of the Act as interpreted by § 1630.2. The articulated exceptions exclude from the ADA's protection, among others, drug abusers, individuals with sexual behavioral disorders, kleptomaniacs, homosexuals, and bisexuals. *Id.*

10. This list is, however, meant to be illustrative, and not exclusive. 29 C.F.R. § 1630, Appendix to Part 1630—Interpretative Guidelines on Title I of the Americans with Disabilities Act, § 1630.2(i).

caused him to alter his lifestyle does not bring him under the umbrella of the ADA's major life activity requirement. Indeed, Soileau fails to identify a specific "major life activity" in which he is impaired. Looking again to the EEOC regulations, the only analogous "major life activity" that may have been impaired, other than Soileau's ability to work, is his ability to care for himself, or perhaps his ability to perform manual tasks. 29 C.F.R. § 1630.2(i). Soileau's own admissions suggest that he is not impaired in either category, or any analogous major life activity. Neither his inability to visit his favorite pub, shop for food at crowded times, nor his inability to get along with his girlfriend implicates a major life activity. While prevailing caselaw has not borne out the parameters of "caring for oneself" or "performing manual tasks," it seems clear that Soileau's inability to get along with others does not fall under either category or more importantly, it does not belong in this list of major life activities. Soileau offers no evidence that he can not carry on the normal activities of daily life, aside from work, despite his disability.[11] The Court concludes that Soileau's inability to interact with others does not implicate a major life activity.

### c. Substantially limits requirement

The Court now turns to whether Soileau's mental impairment "substantially lim-

its" his ability to work—Soileau's surviving major life activity claim.[12] In short Soileau claims that his inability to interact with others at work substantially limits his major life activity of working because he could no longer effectively conduct the PAA surveys and hold meetings, activities which constituted a large part of his workday.

Title 29 C.F.R. § 1630.2(j) defines "substantially limits" as:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Additionally, the EEOC's implementing regulations set forth, and courts have adopted, three factors to be considered in determining whether or not an impairment substantially limits a major life activity. Title 29 C.F.R. § 1630.2(j)(2) lists the following factors to "be considered in determining whether an individual is substantially limited in a major life activity:" "(i) The nature and

11. Soileau's argument that his disability is a life long problem, despite not being symptomatic at all times, does not mitigate the fact that he has failed to implicate a major life activity. His citation to *Vande Zande v. State of Wisconsin Dept. of Admin.*, 44 F.3d 538 (7th Cir.1995) is misguided. In that case, Chief Judge Posner held "an intermittent impairment that is a characteristic manifestation of an admitted disability" is one which an employer must accommodate in relation to the major life activity of working. *Id.* at 544.

12. As the Court has previously determined that Soileau's mere inability to get along with others does not constitute a major life activity, the Court need not determine whether or not he is substantially limited in his ability to complete this activity. However prevailing caselaw clearly supports the position that even if Soileau's inability to get along with others did constitute a major life activity he has not sufficiently shown that he is substantially limited in that activity. To the contrary, that Soileau has altered his lifestyle ac-

cordingly and continues to eat, drink and shop, for example, albeit under different conditions, counters his contention that he is limited in a major life activity. *See, e.g., Muller*, 897 F.Supp. at 1295–96 (plaintiff's disability preventing her from getting along with family and its impact on her life in general failed to show a substantial impact on any major life activity); *Barfield v. Bell South Telecom., Inc.*, 886 F.Supp. 1321, 1324, 1327 (S.D.Miss.1995) (inability to cook, read, drive or attend church or social activities does not demonstrate a substantial limitation on a major life activity); *see also Dutcher*, 53 F.3d at 727 (despite inability to do heavy lifting due to physical impairment, plaintiff could nonetheless feed herself, drive, carry groceries and wash dishes and was thus not substantially limited in a major life activity). *Cf. Coghlan v. H.J. Heinz Co.*, 851 F.Supp. 808 (N.D.Tex.1994) (impairment affecting eating and sleeping substantially limited a major life activity). Courts have held that "one whose impairment merely affects one or more major life activities is not disabled." *Barfield*, 886 F.Supp. at 1324.

severity of the impairment, (ii) The duration or expected duration of the impairment, and (iii) The permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2); *McDonald v. Com. of Pa., Dept. of Public Welfare,* 62 F.3d 92, 95 (3rd Cir.1995); *Hamm v. Runyon,* 51 F.3d 721, 725 (7th Cir.1995); *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 943 (10th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). The evidence does establish that Soileau's condition is permanent, and thus it will have a long term impact on his life. This alone however, does not mitigate the less than severe nature of his disorder. Furthermore the inquiry into the extent that his impairment substantially limits Soileau's ability to work does not end here.

▮ The implementing regulations articulate a more detailed standard governing whether an ADA plaintiff is substantially limited in the ability to work. Title 29 CFR 1630.2(j)(3)(i), states:

> The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

Consequently Soileau must show that his mental impairment "preclude[s] him from more than a narrow range of jobs, it must create a significant barrier to employment generally." *Marschand,* 876 F.Supp. at 1538 (citing *Byrne v. Board of Educ., School of West Allis–West Milwaukee,* 979 F.2d 560, 565 (7th Cir.1992)). Thus, to be substantially limited in the major life activity of working, "an ADA plaintiff must be precluded from working generally." *Kohnke v. Delta Air Lines, Inc.,* 1995 WL 505973 at *4 (N.D.Ill. 1995); *see also Mowat–Chesney v. Children's Hosp.,* 917 F.Supp. 746, 751 (D.Colo 1996) ("The relevant consideration is whether an

individual with a claimed disability is restricted from performing a class of jobs."). If Soileau is in fact capable of performing other jobs, then he is not substantially limited in his ability to work and thus not disabled under the ADA. *See, e.g., Bolton,* 36 F.3d at 944 (evidence showing inability to perform certain physical jobs failed to establish inability to work generally); *Heilweil v. Mt. Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994) (that blood bank director could not work in blood bank did not establish evidence that the plaintiff was unable to work generally), *cert. denied,* — U.S. —, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); *Welsh v. City of Tulsa,* 977 F.2d 1415, 1419 (10th Cir.1992) (plaintiff not disabled simply because numbness of fingers disqualified him from service as a firefighter); *Maulding v. Sullivan,* 961 F.2d 694, 698 (8th Cir.1992) (chemist not disabled simply because chemical sensitivity prevented her from doing lab work), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993); *Mowat–Chesney,* 917 F.Supp. at 751 (D.Colo 1996) (inability to work as a Cath Lab nurse alone does not establish a disability because plaintiff failed to show an inability to work generally). Courts have held that "[w]hile the regulations define a major life activity to include working, this does not necessarily mean working at the job of one's choice." *Welsh,* 977 F.2d at 1417; *see also Bolton,* 36 F.3d at 943 ("The district court correctly ruled that Bolton's inability to return to his particular job without some accommodations does not demonstrate a substantial limitation in the major life activity of working."); *Dotson v. Electro–Wire Prods., Inc.,* 890 F.Supp. 982, 989 (D.Kan.1995) ("ADA plaintiff must prove more than the inability to do his or her former job.").

Soileau does not contend that he is unable to work generally, and his own admissions belie any contention that he was substantially limited in his ability to work generally. Soileau concedes that he was only hampered in completing his PAA reports—but one of his several job requirements. (Soileau Dep. I, 161–62; Dep. II at 344–345, 372).[13] Addi-

---

**13.** At one point Soileau testified that "[f]acilitating process activity analysis [PAA] meetings were the only things that I was unable to do at that time." (Soileau Dep. I at 161–162.) Later he stated: "[O]ther than Process Activity Analysis, I was capable of doing most anything that I normally do." (Soileau Dep. I at 372.)

tionally Soileau contends that he was capable of completing other jobs at Guilford. (Soileau Dep. I at 150, 162.) Dr. Starbird corroborates this fact. (Starbird Dep. at 104–106.) Dr. Starbird testified that Soileau's disorder only prevented him from completing a narrow range of his duties, and that given certain changes in his job description, Soileau could continue to work at Guilford. *Id.* Neither Soileau or Starbird ever contended that Soileau was unable to work generally—a crucial showing to this claim.

Furthermore, that Soileau applied for other jobs, (Soileau Dep. I at 57–60, 76–78, 169, Dep. II at 8–12), putting no restrictions on the type of job requirements he could perform, suggests that he could indeed work.[14] Soileau's disorder clearly does not limit his ability to work generally. Indeed Soileau himself stated that he was capable of working despite his mental condition. (Soileau Dep. I at 76–78.) While Soileau may have been unable to perform some of the specific duties of his job at Guilford, this fact, in and of itself, does not prove that he was unable to work generally.

Courts look to various factors in considering an employee's "employment potential," when assessing one's ability to work generally. Title 29 C.F.R. § 1630.2(j)(3)(ii) lists the following additional considerations in "determining whether an individual is substantially limited in the major life activity of working:"

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is

also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*See also Welsh,* 977 F.2d at 1415 (citing *Jasany v. United States Postal Service,* 755 F.2d 1244, 1249 (6th Cir.1985)).[15] The burden lies with the plaintiff to establish these factors, and the plaintiff must provide "evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs ("few," "many," "most") from which an individual would be excluded because of an impairment." 29 C.F.R. Pt. 1630 App., § 1630.2(j). A plaintiff's failure to do so is fatal at summary judgment. *Marschand,* 876 F.Supp. at 1539.

Soileau's evidence as to his vocational skills or training, or the number and type of jobs which demand similar training from which he would be disqualified due to his disability is insufficient to survive summary judgment. Soileau merely makes conclusory statements that "[t]here are not many jobs [in his area]," and that Soileau "lives in an economically-depressed area of Maine where few jobs are available." (Resp. at 14.) The ADA requires a more significant showing. Soileau provides no evidence of other jobs that he cannot perform, and thus has provided no evidence to establish a substantial barrier to his employment generally. *See Marschand,* 876 F.Supp. at 1540 (summary judgment appropriate as to ADA claim because plaintiff's "cursory description [of his

---

14. Soileau was asked at his deposition "at the time you started your job search efforts, what jobs do you think you were unable to do because of your impairment?" (Soileau Dep. I at 169.) He responded: "I don't know that I felt I was unable to do anything. I think probably a more correct term would be type of jobs that I was hoping to avoid at that period of time." *Id.*

15. In *Welsh v. City of Tulsa,* the Tenth Circuit listed three related factors to aid in the determi-

nation of whether an impairment substantially limits an individual's employment potential:

(1) the number and type of jobs from which the impaired individual is disqualified,

(2) the geographical area to which the individual has reasonable access, and

(3) the individual's job expectations and training.

977 F.2d at 1419.

employment restrictions] gives no indication as to the types of jobs, if any, which are prohibited, how many of these jobs exist in the geographic area to which [the plaintiff] has access, or whether [the plaintiff] has any training or expectations of employment in this field"). *Cf. Haysman,* 893 F.Supp. at 1100 (plaintiff provided statistical evidence as to the percentage of jobs available given impairment); *Scharff v. Frank,* 791 F.Supp. 182, 186–187 (S.D.Ohio 1991) (testimony by vocational expert demonstrated that plaintiff, due to impairment, could not perform approximately half of the unskilled jobs in the local economy that she would otherwise have been qualified to perform).

Because Soileau fails to provide evidence showing a significant restriction in his "ability to perform either a class of jobs or a broad range of jobs in various classes," the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's claims that he is disabled under subsection (A). 29 C.F.R. § 1630.2(j)(3)(i).

### 2. Perceived disability

■ Soileau also contends that he qualifies as disabled under subsection (C)—that is, even if he is not in fact disabled due to an impairment that substantially limits a major life activity, he was "regarded as having such an impairment."[16] The Court again turns to the implementing regulations which define someone who is "regarded as having an impairment" as one who:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as

having a substantially limiting impairment.

29 C.F.R. 1630.2(*l*).

■ Thus Soileau must show more than just that Guilford believed he had a mental impairment. To prevail under subsection (C), Soileau must show that Guilford perceived him as disabled in the sense that he had an impairment that substantially limited a major life activity. *See Kelly v. Drexel Univ.,* 907 F.Supp. 864, 874 (E.D.Pa.1995) (failure to provide evidence that employer treated plaintiff as disabled fatal to ADA "regarded as" claim). The proper focus of the "regarded as" provision is on the impairment's effect upon the attitudes of others. *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995); *Byrne,* 979 F.2d at 567.

Soileau offers no evidence that Earnest, or anyone at Guilford considered him limited, much less substantially limited, in his ability to work either at Guilford or generally. Soileau, himself, admitted that Earnest did not restrict or limit his work responsibilities. To the contrary, the facts indicate that Guilford continued to entrust Soileau with various job responsibilities throughout his employment thus countering any contention that Soileau was perceived as limited in his ability to complete his employment responsibilities. *Howard,* 904 F.Supp. at 930 (evidence that employer continued to assign work to ADA plaintiff establishes that employer did not consider plaintiff to be substantially limited in his ability to work).

■ Even if Earnest did consider Soileau incapable of performing certain functions, such as the PAA reports, that alone would not be actionable under the ADA because "[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *Heilweil,* 32 F.3d at 723; *see e.g., Wooten,* 58 F.3d at 386 (summary judgment granted on "regarded as" claim because plaintiff only perceived to be limited in a narrow range of

---

**16.** "The [regarded as] provision of the ADA was designed to combat invidious stereotypes regarding disabled members of society." *Howard,* 904 F.Supp. at 929–30; *see also School Board of Nassau County v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987) (by enacting the "regarded as" prong "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment.").

meat-packing jobs, and not perceived as generally unable to work other jobs); *Welsh*, 977 F.2d at 1419 ("an impairment that an employer perceives as limiting an individual's ability to perform only one job is not a handicap under the [Rehabilitation] Act."). "[T]he proper test is whether the impairment, as perceived, would affect the individual's ability to find work across the spectrum of same or similar jobs." *Partlow v. Runyon*, 826 F.Supp. 40, 45 (D.N.H.1993); *see also Forrisi v. Bowen*, 794 F.2d 931, 934–35 (4th Cir.1986). As discussed above, Soileau does not succeed in making such a showing. Accordingly the Court concludes that Guilford did not regard Soileau as disabled as contemplated by the ADA.

## B. Retaliation Claim

■ Soileau, in Count II, alleges that Guilford retaliated against him due to his request for a reasonable accommodation under the ADA. Soileau may have a valid claim for retaliation under the ADA, despite his failure to qualify as disabled under the statute because the underlying merits of the discrimination complaint are not dispositive on the issue of retaliation. *See Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986); *Sims v. MME, Paulette Dry Cleaners*, 580 F.Supp. 593, 594 (S.D.N.Y. 1984) (citing *EEOC v. Kallir, Philips, Ross, Inc.*, 401 F.Supp. 66, 70 & n. 6 (S.D.N.Y. 1975), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977)).

The ADA explicitly prohibits employment retaliation. It reads:

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this Act.

42 U.S.C. § 12203(a).

■ The Court first turns to the familiar *McDonnell Douglas* burden-shifting rubric employed in federal anti-discrimination claims involving circumstantial evidence.

*See e.g., Wooster*, 1996 WL 131143 at *8 (ADA and ADEA); *Nedder*, 908 F.Supp. at 73 (ADA); *Braverman*, 859 F.Supp. at 603 (ADEA and ADA). *McDonnell Douglas* sets forth a three-stage process. *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1117 (1st Cir.1993). At the first stage, the burden of proof rests with the plaintiff, who must set forth a prima facie case of discrimination. *Id.* If successful, then a presumption of discrimination arises in the plaintiff's favor, and the burden of production shifts to the defendant. *Lawrence v. Northrop Corp.*, 980 F.2d 66, 69 (1st Cir.1992); *Mesnick v. General Electric Co.*, 950 F.2d 816, 823 (1st Cir.1991). Defendant satisfies its burden by proffering a legitimate, nondiscriminatory reason for its alleged discriminatory conduct. *Udo*, 54 F.3d at 12; *Mesnick*, 950 F.2d at 823 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)).[17] Plaintiff may then refute the defendant's evidence by showing that defendant's asserted rationale constitutes a pretext for the illegal discrimination. *Lawrence*, 980 F.2d at 69.

### 1. Prima facie case

■ To establish a prima facie case of retaliation, a plaintiff must show:

(1) that he or she engaged in activity protected by the ADA;

(2) that an adverse employment action occurred; and

(3) that there exists a causal link between the protected activity and the employment decision.

*See Roth v. Lutheran General Hosp.*, 57 F.3d 1446, 1458 (7th Cir.1995); *Howard*, 904 F.Supp. at 931; *see also Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir.1994) (Title VII); *Hoeppner v. Crotched Mountain Rehabilitation Ctr. Inc.*, 31 F.3d 9, 14 (1st Cir. 1994) (Title VII); *Hazel v. U.S. Postmaster General*, 7 F.3d 1, 3 (1st Cir.1993) (Title VII and ADEA).

■ A plaintiff's initial burden in establishing a prima facie case of retaliation is neither trying nor onerous. *Lipsett v. Uni-*

---

**17.** "The employer's burden at this stage is merely one of production." *Lawrence*, 980 F.2d at 69.

As noted above, the burden of persuasion remains with the plaintiff at all times. *Id.*

*versity of Puerto Rico,* 864 F.2d 881, 899 (1st Cir.1988). To the contrary this burden is "quite easy to meet," and Soileau succeeds in meeting his burden. *Villanueva v. Wellesley College,* 930 F.2d 124, 127 (1st Cir.1991), *cert. denied,* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). He has engaged in the requisite protected activity by asking for a reasonable accommodation to compensate for his psychological problems. *Howard,* 904 F.Supp. at 931. The adverse employment prong is also easily resolved, as Soileau was ultimately fired—an adverse employment action. *Connell v. Bank of Boston,* 924 F.2d 1169, 1179 (1st Cir.), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991).

■ More troubling, is the third and final prong—the causal link between Soileau's protected activity and the adverse employment action. Generally, causation is proved when there is a showing that a "retaliatory motive play[ed] a part in the adverse employment actions." *Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 33 (1st Cir.1990); *see Nakai v. Wickes Lumber Co.,* 906 F.Supp. 698, 705 (D.Me.1995). However, in the absence of any direct evidence of causation courts rely on the concept of temporal proximity to establish causation. In the case at bar, Soileau was fired soon after he requested an accommodation and thus the Court can infer, at this point, that Soileau's termination resulted from his request for a reasonable accommodation. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 110 (1st Cir.1988) ("A showing of [adverse action] soon after the employee engages in [protected activity] is indirect proof of a causal connection between the [adverse action] and the activity because it is strongly suggestive of retaliation."); *Ruffino v. State Street Bank and Trust Co.,* 908 F.Supp. 1019, 1044, 1046 (D.Mass.1995) (causal connection established where adverse actions escalated sharply during and immediately following employee's complaints); *see also Eldred v. Consolidated Freightways Corp. of Delaware,* 898 F.Supp. 928, 940 (D.Mass.1995) (no causal connection where seven years lapsed between plaintiff's protected activity and adverse employment action).

### 2. Defendant's legitimate, nondiscriminatory justification

■ At the second stage of the *McDonnell Douglas* inquiry, the defendant must proffer a legitimate, nondiscriminatory reason for the plaintiff-employee's dismissal. Guilford points to Soileau's poor employment performance as the justification for his termination. Indeed, Guilford argues that Soileau's direct supervisor, Matt Earnest had long been dissatisfied with Soileau's performance. The law recognizes this basis—poor performance—as a legitimate nondiscriminatory justification for terminating an employee. Guilford can legally fire Soileau for any reason, or for no reason at all, as long as the decision to terminate an employee does not arise due to an employee's protected status. *Mesnick,* 950 F.2d at 825; *see, e.g., Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1341 (1st Cir.1988) (The "ADEA does not stop a company from discharging an employee for any reason, (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age").

### 3. Pretext

■ At the third, and final stage of the *McDonnell Douglas* sequence, the Court looks again to the plaintiff, who must articulate a pretext for the discriminatory termination. That is, Soileau must, to avoid summary judgment, proffer specific evidence from which a reasonable factfinder could conclude that Guilford's justification for Soileau's discharge was no more than a pretext, and that the real reason that Soileau was fired was precisely because he requested a reasonable accommodation. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 15–16 (1st Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995). Soileau must offer specific facts to survive this inquiry. "It is not enough for plaintiff merely to cast doubt upon the employer's justification." *Lawrence,* 980 F.2d at 69 (citing *Mesnick,* 950 F.2d at 824).

■ Soileau cannot survive this stage given the evidence presented. Guilford provides compelling evidence that Soileau was

fired for his failure to respond to Guilford's request that he address the specific areas of concern identified by Earnest, within the allotted four week period. Soileau does not dispute that he failed to respond as required, (Soileau Dep. II, at 329–32), and the consequence of such inaction—Soileau's termination—was threatened in the warning.

Additionally, the evidence shows that Soileau's recent difficulties at Guilford predated any acknowledgment, or announcement on his part that he was suffering psychological problems, thus negating an inference that his termination came as a result of either his requested accommodation or his alleged disability. Indeed, Soileau concedes that he had problems with Earnest since the beginning of Earnest's tenure at Guilford, and that Earnest suspended him in late March before he either requested an accommodation or discussed his problems with Earnest. *See, e.g., Henry v. Guest Services,* 902 F.Supp. 245, 253 (D.D.C.1995) ("Plaintiff's performance woes began well before he was diagnosed with depression and substantially in advance of his EEOC complaint and subsequent discharge."). Soileau was "far down the path of progressive disciplinary action" when he sought an accommodation, and the fact that he asked for such action cannot now recast those facts. *Barfield,* 886 F.Supp. at 1327–28.

### IV. Conclusion

To prevail on either his discrimination or harassment claim, Soileau must qualify as disabled as defined under the ADA. Specifically Soileau must prove that either he has a mental impairment that substantially limits his ability to work, or alternatively that he is perceived as disabled. He has failed to prove either contention. Additionally, Soileau has failed to establish the necessary animus on the part of Guilford to state a claim of employment retaliation. As Soileau's MHRA claim hinges on the outcome of his ADA claims, this claim too must fail. Accordingly, the Court grants Defendant's Motion for Summary Judgment on all counts.

*It is so ORDERED.*